**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re | Chapter 11 |
| R.E. GAS DEVELOPMENT, LLC, *et al.*,[1] | Case No. 18-22032 (JAD) |
| Debtors. | (Joint Administration Requested) |
| R.E. GAS DEVELOPMENT, LLC, *et al.*, | |
| Movants, | |
| v. | |
| NO RESPONDENT, | |
| Respondent. | |

**DEBTORS' EMERGENCY MOTION FOR AN ORDER**
**AUTHORIZING THE DEBTORS TO CONTINUE**
**THEIR INSURANCE PROGRAMS AND PAY RELATED OBLIGATIONS**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") move the Court (this "Motion"), pursuant to sections 105, 363(b)(1), 503(b)(1), 1107(a) and 1112(b)(4)(C)(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 9013-1 of the Local Bankruptcy Rules of the U.S. Bankruptcy Court for the Western District of Pennsylvania (the "Local Rules"), for the entry of an order, in substantially the form attached as Exhibit A (the "Proposed Order"), (i) authorizing, but not directing, the Debtors to continue their existing Insurance Policies (as defined below); (ii) authorizing, but not directing, the Debtors to

---

[1] The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): R.E. Gas Development, LLC (5422); Rex Energy Corporation (4402); Rex Energy Operating Corp. (0390); and Rex Energy I, LLC (9799). The address of each of the Debtors is 366 Walker Drive, State College, Pennsylvania 16801.

pay certain (a) prepetition Insurance Obligations (as defined below) in an amount not to exceed $95,809.56 and (b) postpetition Insurance Obligations in the ordinary course of business; and (iii) granting related relief, each subject to any order governing the use of cash collateral and approving debtor in possession financing.  In support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### A. General Background

2. On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are continuing in possession of their properties and are managing their business, as debtors in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3. Debtor R.E. Gas Development, LLC ("R.E. Gas") is a Delaware limited liability company headquartered in State College, Pennsylvania.  Substantially all of the assets of R.E. Gas are located in Pennsylvania.  Its parent entity is Rex Energy Corporation ("Rex Energy"), a Delaware corporation.  Rex Energy was incorporated and became a public company in 2007.  Each of the other Debtors is a wholly-owned direct subsidiary of Rex Energy.  The Debtors are independent oil and gas companies operating in the Appalachian Basin, engaged in the acquisition, production, exploration and development of oil, natural gas and natural gas liquids.  The Debtors are focused on drilling and exploration activities in the Marcellus Shale, Utica Shale and Upper Devonian Shale.

4. Additional information regarding the Debtors and these chapter 11 cases (these "Cases"), including the Debtors' business, corporate structure, financial condition and reasons for and objectives of these Cases, is set forth in the *Declaration of Thomas C. Stabley in Support of First Day Pleadings* (the "First Day Declaration"), filed contemporaneously herewith and incorporated herein by reference.

**B.    The Insurance Policies**

5. In the ordinary course of their business, the Debtors maintain the following types of insurance policies, among others: commercial property, inland marine (care, custody and control), commercial general liability, pollution liability, commercial automobile, commercial umbrella/excess liability, directors and officers liability, employment practices liability, fiduciary liability, employed lawyers liability, cyber liability, control well coverage and workers' compensation (collectively, as such policies may be supplemented, amended, extended, renewed or replaced, the "Insurance Policies").[2]  The Insurance Policies are essential to preserve the value of the Debtors' estates and, in some cases, are required by various laws, regulations or contracts that govern the Debtors' business.

6. The Debtors maintain the Insurance Policies through several different insurance carriers (collectively, the "Insurance Carriers").  The names of the Insurance Carriers, the terms of the current policies and the annual premiums paid thereunder are set forth on Exhibit B attached hereto.  The aggregate amount of the annual premiums under all of the Insurance Policies total approximately $1,514,363.00 (collectively, the "Premiums").

---

[2]   A list of the Debtors' Insurance Policies is set forth on Exhibit B hereto.  Although the Debtors believe that the list of Insurance Policies set forth on Exhibit B is substantially complete, the relief requested herein is intended to be applicable with respect to all Insurance Policies and is not limited to those listed on Exhibit B.

NAI-1503725645v1

7. It is not always economically advantageous for the Debtors to pay the Premiums on all of the Insurance Policies on a lump-sum basis. Accordingly, in the ordinary course of the Debtors' business, the Debtors finance the payment of insurance premiums for all but three of the Insurance Policies (collectively, the "Financed Policies") pursuant to installment plans (the "Installment Plans"). With respect to the Financed Policies, the Installment Plans provide for financing the majority of the Debtors' annual premiums (approximately 75 percent thereof, with the remainder being paid upfront by the Debtors as a down payment), and the cost of the Debtors' credit as a yearly rate ranges from 4.18 percent to 6.34 percent.

8. The Debtors estimate that they owe $95,809.56 in Premiums arising from both the prepetition and postpetition periods, to the Insurance Carriers, which will become due and owing in the first 30 days of these Cases. In connection with extending and/or renewing the Insurance Policies postpetition, the Debtors will not owe any amounts during the first 30 days of these Cases.

### 1. Workers' Compensation Insurance

9. Under the laws of the states in which they operate, the Debtors are required to maintain workers' compensation insurance coverage (the "Workers' Compensation Program") for their employees for claims arising from, or related to, their employment by the Debtors. Employees of the Debtors are covered by an insurance policy maintained with Federal Insurance Company (a Chubb company).

10. The Workers' Compensation Program is a Financed Policy, and Rex Energy Corporation entered into a financing agreement with Premium Assignment Corporation. Upon entry into the Workers' Compensation Program on February 9, 2018, the Debtors paid 25 percent of the annual premium and agreed to pay the remaining 75 percent and financing costs in 10 equal monthly payments throughout the coverage period. For the current coverage period, the

NAI-1503725645v1

total price (including financing costs) of the Debtors' annual premium for the Workers' Compensation Program is approximately $100,235.45, which includes $2,154.45 in financing costs. The Debtors estimate that they owe no more than $7,571.52 in prepetition Premiums on account of the Workers' Compensation Program, the entirety of which will become due and owing in the first 30 days of these Cases.

**2.    The Liability and Property Insurance Programs**

11.    Through a variety of Insurance Carriers, the Debtors maintain liability and property insurance policies, which provide the Debtors with insurance coverage for liabilities relating to, among other things, property damage, pollution, products liability, commercial automobile liability and various other property-related and general liabilities, as well as excess policies related to the same (collectively, the "Liability and Property Insurance Programs"). The Debtors maintain the Liability and Property Insurance Programs to help manage the various risks associated with their businesses. Continuation of the Liability and Property Insurance Programs, therefore, is essential to the ongoing operations of the Debtors' businesses and the preservation of their estates.

12.    The Debtors maintain ten Insurance Policies under their Liability and Property Insurance Programs. Nine of those Insurance Policies are Financed Policies, and Rex Energy Corporation entered into a financing agreement (the "General PFA") with Premium Assignment Corporation to finance these nine policies. The General PFA includes financing for all of the Financed Policies other than the Workers' Compensation Program, which is the subject of a separate financing agreement. Upon entry into the financed Liability and Property Insurance Programs and the D&O Policies (as defined below) on July 24, 2018, the Debtors paid 25 percent of the annual premiums under all of those policies and agreed to pay the remaining 75 percent and financing costs in 10 equal monthly payments throughout the coverage period. For

the current coverage period, the total price (including financing costs) of the Debtors' annual premiums for the financed Liability and Property Insurance Programs and the D&O Policies (as defined below) is approximately $1,170,949.85, which includes $16,672.04 in financing costs.

13.     On or about January 11, 2017, upon entry into the one policy under the Liability and Property Insurance Programs that is not a Financed Policy (the pollution liability policy with Ironshore Specialty Insurance Company), the Debtors paid the entire annual premium and all related costs for that policy, $94,729.95.  Accordingly, the Debtors do not owe any amounts on account of the one policy under the Liability and Property Insurance Programs that is not financed.

14.     The Debtors estimate that they owe no more than $54,144.14 in prepetition Premiums on account of the Liability and Property Insurance Programs, the entirety of which will become due and owing in the first 30 days of these Cases.

### 3.     D&O and Fiduciary Insurance Policies

15.     In addition to the Workers' Compensation Program and Liability and Property Insurance Programs, the Debtors maintain nine insurance policies that provide liability coverage for directors and officers and other fiduciaries of the Debtors (the "D&O Policies").  All of the D&O Policies are Financed Policies, each financed pursuant to General PFA.  Again, as set forth above, upon entry into the D&O Policies and the financed Liability and Property Insurance Programs on July 24, 2017, the Debtors paid 25 percent of the annual premiums under those policies and agreed to pay the remaining 75 percent and financing costs in 10 equal monthly payments throughout the coverage period.  For the current coverage period, the total price (including financing costs) of the Debtors' annual premiums for the D&O Policies and the financed Liability and Property Insurance Programs is approximately $1,170,949.85, which includes $16,672.04 in financing costs.

NAI-1503725645v1

16. The first policy is a fiduciary policy (the "Fiduciary Policy") provided by National Union Fire Insurance Company of Pittsburgh, PA ("National Union") that insures individuals involved with the management of certain of the Debtors' trusts and benefit plans from liability incurred in their capacity as fiduciaries of such plans. For the current coverage period ending on July 24, 2018, the Debtors' annual premium for the Fiduciary Policy is approximately $1,500.00.

17. The second policy is an employment practices policy (the "Employment Practices Policy") providing coverage in connection with sexual harassment, discrimination and wrongful termination claims. National Union is the Insurance Carrier under the Employment Practices Policy. For the current coverage period ending on July 24, 2018, the Debtors' annual premium for the Employment Practices Policy is approximately $20,000.00.

18. The third policy is an employed lawyers liability policy (the "Employed Lawyers Policy") that also provides coverage in connection with sexual harassment, discrimination and wrongful termination claims. National Union is the Insurance Carrier under the Employed Lawyers Policy. For the current coverage period ending on July 24, 2018, the Debtors' annual premium for the Employed Lawyers Policy is approximately $10,556.00.

19. Additionally, the Debtors have a policy that delivers baseline coverage for the Debtors' directors and officers (the "Baseline D&O Policy"), and National Union is the Insurance Carrier thereunder. For the current coverage period ending on July 24, 2018, the Debtors' annual premium for the Baseline D&O Policy is approximately $212,000.00.

20. The Debtors have five different excess liability policies that provide additional coverage for certain of the Debtors' directors and officers (collectively, the "Excess Liability D&O Policies")—one with AXIS Insurance Company, two with Old Republic Insurance Company, one with XL Specialty Insurance Company and one with National Union. For the

NAI-1503725645v1

current coverage period ending on July 24, 2018, the Debtors' annual premiums for the Excess Liability D&O Policies is approximately $199,844.00.

21. Accordingly, the Debtors estimate that they owe no more than $34,093.90 in prepetition Premiums on account of the D&O Policies, the entirety of which will become due and owing in the first 30 days of these Cases.

**4.  Cyber Liability Insurance Policy**

22. The Debtors maintain a cyber liability policy that provides coverage to the Debtors and their subsidiaries for information security and privacy liability (the "Cyber Liability Policy"). For the current coverage period ending on November 18, 2018, the Debtors' annual premium is approximately $26,786.00. The Cyber Liability Policy is not a Financed Policy, and the Debtors paid the entire annual premium upon entry into the Cyber Liability Policy. Accordingly, the Debtors do not owe any amounts on account of the Cyber Liability Policy.

**5.  Control of Well Insurance Policy**

23. The Debtors have a policy that provides coverage for regaining control of a well in a blowout scenario (the "Well Control Policy"). For the current coverage period ending on November 16, 2018, the Debtors' annual premium is approximately $149,724.00.[3] The Well Control Policy is not a Financed Policy, and the Debtors paid the entire annual premium upon entry into the Well Control Policy. Accordingly, the Debtors do not owe any amounts on account of the Well Control Policy.

---

[3] The Insurance Carrier for the Well Control Policy inadvertently charged the Debtors $544.00 more than the annual premium. The annual premium, however, is adjusted quarterly based on the services actually used by the Debtors. Historically, the Debtors have exceeded the annual premium and owed the Insurance Carrier additional amounts, and the $544.00 will go towards any additional amounts owed. To the extent the Debtors use services in an amount that does not exceed the annual premium during the policy term, the Insurance Carrier will credit the Debtors for the portion of the annual premium (including the $544.00) not used.

### 6. Insurance Broker

24. The Debtors utilize USI Insurance Services ("the "Broker") as their insurance broker to assist with, among other things, the procurement and negotiation of the Insurance Policies and to remit payment to the Insurance Carriers directly or through the premium financing agreements, on behalf of the Debtors for the current policy periods. In connection with these services, the Debtors pay certain fees to the Broker (the "Broker's Fees"). The Broker's Fees are not separately calculated from or paid in addition to the Premiums, and the Debtors do not believe that any Broker's Fees are due to the Broker at this time.

### RELIEF REQUESTED

25. The Debtors request entry of an order, in substantially the form of the Proposed Order, authorizing, but not directing, them to (a) honor all of their prepetition obligations under the Insurance Policies, including related premiums, deductibles, reimbursement or retention amounts, amounts owed pursuant to premium financing agreements and amounts owed to the Broker (collectively, the "Insurance Obligations"), in their discretion, in an amount not to exceed $95,809.56; (b) honor all of their postpetition Insurance Obligations, in their discretion, in the ordinary course of business; and (c) maintain, supplement, amend, extend, renew and/or replace, without further Court approval, the Insurance Policies, and to pay any related Premiums or amounts owed pursuant to premium financing agreements, in their discretion, in each case subject to any order governing the use of cash collateral and any order approving debtor in possession financing.

26. The Debtors also request that all applicable banks and other financial institutions receive, process, honor and pay all checks and electronic payment requests relating to the Insurance Obligations, whether such checks or electronic payment requests were presented

NAI-1503725645v1

before or after the Petition Date provided that sufficient funds are on deposit in the applicable accounts.  Finally, the Debtors request that the order be enforceable immediately upon entry.

**BASIS FOR RELIEF**

    A.    **The Doctrine of Necessity Supports the Payment of Prepetition Insurance Obligations**

    27.    It is in the best interest of the Debtors' estates that their prepetition Insurance Obligations be satisfied in full, and the Court has the authority under the Bankruptcy Code to permit the Debtors to satisfy such obligations.  The Court's authority to approve the payment of prepetition claims derives from both the Bankruptcy Code and the common law "doctrine of necessity."

    28.    "The 'doctrine of necessity' or 'necessity of payment' doctrine is a general rubric for the proposition that a court can authorize the payment of prepetition claims if such payment is essential to the continued operation of the debtor." *In re Motor Coach Indus. Int'l*, No. 09-078 (SLR), 2009 U.S. Dist. LEXIS 10024, at *7 n.5 (D. Del. Feb. 10, 2009).  Under the doctrine of necessity, a bankruptcy court may exercise its equitable power to authorize a debtor to pay critical prepetition claims, even though such payment is not explicitly authorized under the Bankruptcy Code.  *See In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 939 (Bankr. D. Del. 1992) (citing *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (recognizing that "if payment of a pre-petition claim 'is essential to the continued operation of [the debtor], payment may be authorized'")).

    29.    Additionally, at least five Bankruptcy Code provisions support the payment of prepetition Insurance Obligations:  (a) section 503(b) provides that the Court may permit the Debtors to pay any "actual, necessary costs and expenses of preserving the estate"; (b) section 363(b)(1) provides that after notice and a hearing, a debtor may "use, sell, or lease,

other than in the ordinary course of business, property of the estate"; (c) section 1107(a) provides a debtor-in-possession with all rights, powers and duties of a trustee, which includes the duty to maximize the value of the estate;[4] (d) section 1112(b)(4)(C) requires a debtor to maintain appropriate insurance; and (e) section 105(a) permits the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

30.     Citing a combination of the above-identified Bankruptcy Code provisions and the doctrine of necessity, courts have repeatedly recognized "the existence of the judicial power to authorize a debtor . . . to pay prepetition claims where such payment is essential to the continued operations of the debtor." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); *see also In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (finding that a debtor is entitled to pay certain prepetition creditors upon a showing that the payment is "essential to the continued operation of the business") (citations omitted); *In re Just for Feet, Inc.*, 242 B.R. 821, 825 (D. Del. 1999) ("The Supreme Court, the Third Circuit and the District of Delaware all recognize the court's power to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during chapter 11."); *In re Lehigh & New England Ry. Co.*, 657 F.2d at 581 (recognizing that "if payment of a [prepetition] claim . . . is essential to the continued operation of the [debtor,] . . . payment may be authorized . . ."); *Friedman's Inc. v. Roth Staffing Cos., LP (In re Friedman's Inc.)*, No. 09-10161 (CSS), 2011 Bankr. LEXIS 4500, at *7 (Bankr. D. Del. Nov. 30, 2011) ("[M]ost courts will allow [the payment of prepetition claims] under the 'doctrine of necessity,' if the debtor establishes that in its business judgment making such payments is critical to the survival of the debtor's business.").

---

[4]     *See In re Brook Valley VII*, 496 F.3d 892, 900-01 (8th Cir. 2007) (a debtor in possession has a duty "to maximize the value of the estate") (quoting 7 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 1107.02[4] (15th ed. 1998)).

31. The Court's exercise of its authority under the "doctrine of necessity" and the above cited provisions is appropriate to carry out specific statutory provisions of chapter 11, specifically sections 1107(a), 1108 and 363(b)(1) of the Bankruptcy Code, which collectively authorize a debtor in possession to maintain and operate the debtor's business and use estate property. Indeed, a debtor in possession operating a business under section 1108 of the Bankruptcy Code has a duty to protect and preserve the value of its business, and prepetition claims may be paid if essential to the continued operation of the debtor. *See In re Just for Feet, Inc.*, 242 B.R. at 825 (authorizing, under the "necessity of payment doctrine," payment of prepetition claims outside of the plan because such claims were "essential to the continued operation of the debtor").

32. The payment of the Insurance Obligations satisfies these criteria. The relief requested herein is necessary for the Debtors to continue to operate during the course of these Cases and complies with certain contractual obligations and applicable law.[5] The Debtors are *required* to maintain their insurance programs under section 1112(b)(4) of the Bankruptcy Code and under applicable United States Trustee Guidelines. Section 1112(b)(4)(C) of the Bankruptcy Code provides that a chapter 11 case may be converted to a case under chapter 7 "for cause," and "cause" includes a debtor's "failure to maintain appropriate insurance that poses a risk to the estate or to the public." *See* 11 U.S.C. § 1112(b)(4)(C). Likewise, the United States Trustee guidelines state that "[a] debtor must maintain appropriate insurance coverage . . . . Depending

---

[5] To the extent any of the Insurance Policies or related agreements are deemed to constitute an executory contract within the meaning of section 365 of the Bankruptcy Code, the Debtors do not, at this time, seek to assume any such contract. Accordingly, if the Court authorizes the payments described above, such payments should not be deemed to constitute a postpetition assumption or adoption of the programs, policies or agreements as executory contracts. The Debtors reserve all of their rights under the Bankruptcy Code with respect to the Insurance Policies, and the authorization to pay amounts due under the Insurance Policies should not affect the Debtors' right to contest the amount or validity of these obligations.

on the case, the debtor may be required to maintain all or a combination of fire and extended liability insurance, general liability insurance, worker's compensation and unemployment insurance, employee health insurance . . . malpractice insurance, product liability insurance, and liquor or dramshop insurance" and "[a] debtor's failure to maintain proper insurance is a breach of its fiduciary obligations." *See* U.S. Dep't of Justice, Chapter 11 Case Administration, https://www.justice.gov/ust/file/volume_3_chapter_11_case_administration.pdf/. If the Debtors do not honor their prepetition obligations under the Insurance Policies, the Debtors' coverage may lapse and they may need to obtain alternative insurance coverage at an increased cost. Indeed, were coverage to lapse, they may be unable to obtain alternative replacement insurance at a critical juncture in these Cases.

33. Accordingly, the doctrine of necessity, in combination with the above cited authorities, authorize the payment of the Insurance Obligations in full. Indeed, courts in this district and other districts in the Third Circuit routinely authorize debtors to pay prepetition insurance obligations. *See*, *e.g.*, *In re M & G USA Corporation*, No. 17-12307 (BLS) (Docket No. 63) (Bankr. D. Del. Nov. 1, 2017); *In re rue21, inc.*, No. 17-22045 (GLT) (Docket No. 510) (Bankr. D. Del. June 12, 2017); *In re TK Holdings Inc.,* No. 17-11375 (BLS) (Docket No. 443) (Bankr. D. Del. Aug. 9, 2017); *In re Tidewater Inc.*, No. 17-11132 (BLS) (Docket No. 222) (Bankr. D. Del. Jun. 13, 2017); *In re PTC Seamless Tube Corp.*, No. 15-21445 (TPA) (Docket No. 154) (Bankr. W.D. Pa. May 19. 2015).[6]

---

[6] Because of their voluminous nature, the orders cited herein are not attached to this Motion. Copies of these orders are, however, available upon request to proposed chapter 11 counsel to the Debtors.

NAI-1503725645v1

    **B.**    **Section 363(c)(1) of the Bankruptcy Code also Authorizes the Debtors to Maintain their Insurance Policies and to Renew such Policies during these Cases**

34.    The Bankruptcy Code authorizes the Debtors to maintain their Insurance Policies and to renew them postpetition, as necessary. Under section 363(c)(1) of the Bankruptcy Code, a debtor-in-possession may "enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). The Debtors—and most companies—routinely maintain their insurance policies and programs, and enter into renewals of, obtain or extend, new insurance policies in the ordinary course of business. Maintenance and renewal of insurance policies falls squarely within section 363(c)(1) of the Bankruptcy Code.[7]

35.    Moreover, the Debtors have compelling reasons to continue their Insurance Policies. Without insurance coverage, the Debtors and their estates would be immediately exposed to potentially catastrophic liability to the detriment of their creditors. Further, if the Debtors were not permitted to maintain and renew their current Insurance Policies, any

---

[7] To the extent that the Court concludes that any of the Debtors' Insurance Policies are not maintained or renewed in the ordinary course of business, the Court should nevertheless authorize the Debtors to maintain and renew such policies outside the ordinary course of business under section 363(b)(1) of the Bankruptcy Code because there is sound business judgment for doing so. *See* 11 U.S.C. § 363(b)(1) (authorizing a debtor, after notice and a hearing, to "use, sell, or lease, other than in the ordinary course of business, property of the estate"); *In re Shubh Hotels Pittsburgh, LLC*, 439 B.R. 637, 639 (Bankr. W.D. Pa. 2010) ("Courts have held that in determining whether to authorize a debtor's use, sale or lease of property of the estate under Section 363(b)(1), the debtor-in-possession is required to show that a sound business purpose justifies the debtor's contemplated actions."); s*ee also In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.") (citation omitted); *In re Dura Auto. Sys.*, No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *259-60 (Bankr. D. Del. Aug. 15, 2007) ("[I]f a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1)").

replacement insurance policies could probably be obtained only at a greater cost, if such replacement policies could be obtained at all.

36. For the foregoing reasons, the Debtors request that the Court authorize the Debtors to maintain, supplement, amend, extend, renew and/or replace their Insurance Policies and any related premium financing agreements, without further Court approval.

### C. The Court Should Authorize All Applicable Banks and Financial Institutions to Honor and Pay Checks in Connection with the Insurance Policies and Insurance Obligations

37. In addition, by this Motion, the Debtors request that all applicable banks and other financial institutions (collectively, the "Banks") be authorized, when requested by the Debtors, to receive, process, honor and pay any and all checks presented for payment of, and to honor all fund transfer requests made by the Debtors related to, the Insurance Obligations, whether such checks were presented, or fund transfer requests were submitted, prior to or after the Petition Date, as applicable, provided that sufficient funds are available in the applicable accounts to make the payments. The Debtors represent that these checks are drawn on specific disbursement accounts and can be readily identified as relating directly to the authorized payment of the Insurance Obligations. Accordingly, the Debtors believe that such checks should be honored.

### REQUESTS FOR IMMEDIATE RELIEF AND WAIVER OF STAY

38. Pursuant to Bankruptcy Rules 6003(b) and 6004(h), the Debtors seek (a) immediate entry of an order granting the relief sought herein and (b) a waiver of any stay of the effectiveness of such an order. Bankruptcy Rule 6003(b) provides, in relevant part, that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant relief regarding . . . a motion to pay all or part of a claim that arose before the filing of the petition." Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral

is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." From this, courts have ruled that, where the failure to grant any such requested relief would result in immediate and irreparable harm to a debtor's estate, a court may allow a debtor to pay all or part of a claim that arose prepetition immediately.

39. As set forth above, the payment of the Insurance Obligations and maintenance of the Insurance Policies is necessary to prevent immediate and irreparable damage to the Debtors' estates and preserve the value of their assets. Payment of the Insurance Obligations is necessary to ensure that the estates' assets are protected from incurring potentially devastating liabilities, which if incurred without the protection of the Insurance Policies, could prevent the Debtors from successfully reorganizing. Accordingly, the Debtors submit that ample cause exists to justify (a) the immediate entry of an order granting the relief sought herein and (b) a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

## RESERVATION OF RIGHTS

40. Nothing contained herein is intended to be or should be construed as: (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' rights or any other party-in-interests' rights to dispute any claim on any grounds; (c) a promise to pay any claim; (d) an implication or admission that any particular claim would constitute a claim for an Insurance Obligation; or (e) the assumption of any executory contract or unexpired lease.

## NOTICE

41. Notice of this Motion will be provided to: (a) the Office of the United States Trustee for the Western District of Pennsylvania; (b) the United States Attorney for the Western District of Pennsylvania; (c) those creditors holding the 30 largest unsecured claims against the Debtors; (d) Simpson Thacher & Bartlett LLP, as counsel to Angelo, Gordon Energy Servicer,

NAI-1503725645v1

LLC in its capacity as Administrative Agent and Collateral Agent for the Prepetition First Lien Credit Agreement; (e) Wilmington Savings Fund Society, FSB, as the indenture trustee for those certain 1.00%/8.00% Senior Secured Second Lien Notes due 2020 (the "Prepetition Second Lien Notes"); (f) Akin Gump Strauss Hauer & Feld LLP, as counsel to an ad hoc group of holders of the Prepetition Second Lien Notes; (g) BOKF, NA, as the indenture trustee for those certain 8.875% Senior Notes due 2020 and 6.250% Senior Notes due 2022; (h) the Internal Revenue Service; (i) the Securities and Exchange Commission; (j) the office of the attorney general for the states in which the Debtors operate; (k) the Insurance Carriers; (l) Premium Assignment Corporation; (m) the Broker; (n) the Banks; and (o) all parties entitled to notice pursuant to the Local Rules. As this Motion is seeking "first day" relief, this Motion and any order entered hereon will be served in accordance with the Local Rules. Due to the nature of the relief requested herein, the Debtors respectfully submit that no further notice of this Motion is necessary.

**NO PRIOR REQUEST**

42.     No prior request for the relief sought herein has been made to this Court or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Order and grant such other and further relief as may be appropriate.

NAI-1503725645v1

| | |
|---|---|
| Dated: May 18, 2018<br>(Pittsburgh, Pennsylvania) | Respectfully submitted,<br><br>/s/ *James D. Newell*<br>James D. Newell (PA 51337)<br>Timothy P. Palmer (PA 86165)<br>Tyler S. Dischinger (PA 314299)<br>BUCHANAN INGERSOLL & ROONEY PC<br>One Oxford Centre<br>301 Grant Street, 20th Floor<br>Pittsburgh, PA 15219-1410<br>Telephone: (412) 562-8800<br>Facsimile: (412) 562-1041<br>Email: james.newell@bipc.com<br>           timothy.palmer@bipc.com<br>           tyler.dischinger@bipc.com<br><br>- and -<br><br>Scott J. Greenberg<br>Michael J. Cohen<br>Anna Kordas<br>JONES DAY<br>250 Vesey Street<br>New York, NY 10281-1047<br>Telephone: (212) 326-3939<br>Facsimile: (212) 755-7306<br>Email: sgreenberg@jonesday.com<br>           mcohen@jonesday.com<br>           akordas@jonesday.com<br><br>- and -<br><br>Thomas A. Howley<br>JONES DAY<br>717 Texas, Suite 3300<br>Houston, TX 77002-2712<br>Telephone: (832) 239-3939<br>Facsimile: (832) 239-3600<br>Email: tahowley@jonesday.com<br><br>PROPOSED CO-COUNSEL FOR THE DEBTORS<br>AND DEBTORS IN POSSESSION |

4850-8099-0822, v. 1