**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| R.E. GAS DEVELOPMENT, LLC, *et al.*,[1] | : | Case No. 18-22032 (JAD) |
| | : | |
| Debtors. | : | (Joint Administration Requested) |
| | : | |
| | : | |
| R.E. GAS DEVELOPMENT, LLC, *et al.*, | : | |
| | : | |
| Movants, | : | |
| | : | |
| v. | : | |
| | : | |
| NO RESPONDENT, | : | |
| | : | |
| Respondent. | : | |

**DECLARATION OF THOMAS C. STABLEY**
**IN SUPPORT OF FIRST DAY PLEADINGS**

I, Thomas C. Stabley, declare and state as follows:

1.      I am the Chief Executive Officer and President of each of the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"). I co-founded what would become Rex Energy Corporation ("Rex Energy") in 2004 and have been its Chief Executive Officer since October 2011 and its President since August 2015. Prior to that, I served as its Chief Financial Officer from March 2007 to June 2012 and also served as its Principal Accounting Officer from March 2007 until May 2012. I served as an Executive Vice President from February 2008 to October 2011.

---

[1]      The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): R.E. Gas Development, LLC (5422); Rex Energy Corporation (4402); Rex Energy Operating Corp. (0390); and Rex Energy I, LLC (9799). The address of each of the Debtors is 366 Walker Drive, State College, Pennsylvania 16801.

2.        Prior to my employment at Rex Energy, I served as Vice President of Accounting of Shaner Hotels from January 1998 to March 2004, managing a diverse staff of accountants in oil and gas, real estate, cable television and tax.  I also served in various accounting positions since 1993, gaining significant experience in energy, real estate and auditing.

3.        I earned a Bachelor of Arts degree in accounting from the University of Pittsburgh.

4.        On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition (collectively, the "Petitions") with this Court for relief under chapter 11 of the Bankruptcy Code, as well as a number of motions requesting various forms of "first day" relief (collectively, the "First Day Pleadings").

5.        I submit this Declaration in support of the Petitions and the First Day Pleadings. The relief requested in the First Day Pleadings is necessary to maximize the value of the Debtors' estates and allow them to sustain their current operations in chapter 11 while they pursue a sale of substantially all of their U.S. assets or an alternative restructuring pursuant to a chapter 11 plan.

6.        I am familiar with the contents of each First Day Pleading (including the exhibits and other attachments to such pleadings) and, to the best of my knowledge, after reasonable inquiry, believe that the relief sought in each First Day Pleading:  (a) will enable the Debtors to sustain their current level of operations while in chapter 11; (b) is critical to the Debtors' ability to maximize the value of their chapter 11 estates; and (c) best serves the interests of the Debtors' estates and creditors.  Further, it is my belief that the relief sought in the First Day Pleadings is in each case narrowly tailored and necessary to achieve the goals identified above.

7.      As the Chief Executive Officer and President of Rex Energy, I am familiar with the Debtors' day-to-day operations, assets, financial condition, business affairs and books and records.  Except as otherwise indicated, all facts set forth in this declaration are based upon: (a) my personal knowledge; (b) information supplied to me by other members of management, professionals or employees; (c) my review of relevant documents; and/or (d) my opinion based upon my experience and knowledge of the Debtors' assets, liabilities and financials.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration. The Debtors have authorized me to submit this Declaration.

8.      This Declaration is divided into five parts.  Part I sets forth an executive summary.  Part II provides an overview of the Company and the Debtors' business, corporate structure and prepetition indebtedness.  Part III discusses the Debtors' recent financial performance, the circumstances surrounding the commencement of these chapter 11 cases and what the Debtors view as the path forward.  Part IV provides an overview of the proposed DIP Facility.  Finally, Part V discusses the First Day Pleadings.

## I.   EXECUTIVE SUMMARY

9.      R.E. Gas Development, LLC and its affiliates (the "Company") are independent publicly-traded oil and gas companies operating in the Appalachian Basin.  The Company is engaged in the acquisition, production, exploration and development of oil, natural gas and natural gas liquids ("NGLs").  It is focused on drilling and exploration activities in the Marcellus Shale, Utica Shale and Upper Devonian Shale, predominantly at sites throughout Western Pennsylvania.

10.     Over the years, the Company has utilized a balanced growth strategy of exploiting its sizable inventory of high potential exploration drilling prospects while actively seeking to acquire complementary oil and natural gas properties.  However, the steep decline in crude oil

and natural gas prices that began in 2014 has adversely affected the Debtors' liquidity and balance sheet.  In order to maintain liquidity, the Company has made considerable efforts in engaging its lenders with the goal of reducing its debt to a manageable level in light of the Company's operational realities.

11.    After an extensive period of good faith negotiations, the Debtors and their secured lenders holding in excess of $680 million in funded debt agreed on the terms of a restructuring, as embodied in the RSA (as defined below) and the accompanying term sheets, pursuant to which the Debtors would pursue a sale of all or substantially all of the Debtors' assets, or, if the Sale Process (as defined below) does not result in receipt of qualified bids, a plan process pursuant to which the Company's first lien lenders would become the owners of the reorganized Company's equity.  The terms embodied in the RSA represent the best path forward for the Debtors, and the settlement of the Make Whole (as defined below) will avoid a protracted and expensive litigation between the Debtors, the Prepetition First Lien Lenders and the Prepetition Second Lien Noteholders.  The RSA also gives the Debtors the ability to implement a thorough Sale Process that will hopefully deliver the greatest returns for all of the Debtors' stakeholders.

12.    In order to provide the Debtors with sufficient liquidity to pursue the agreed-upon restructuring efforts, the Debtors seek access to a $411,315,322 debtor in possession financing (the "DIP Facility"), of which upon entry of the final order approving such financing, $311,315,322 will be borrowed to permanently roll up $261,315,322 of the outstanding loans and $50,000,000 on account of the settlement of the Make Whole outstanding under the Prepetition First Lien Credit Agreement (each as defined below).  The DIP Facility will, among other things, fund the working capital needs of the Debtors' operations while they pursue their restructuring efforts.

## II.  OVERVIEW OF THE DEBTORS' BUSINESS

13.     The Company was founded in 2004 as a series of limited partnerships.  Rex Energy, the parent entity, was incorporated in the state of Delaware on March 8, 2007.  The Company's headquarters are located in State College, Pennsylvania.  The Company also has a regional office in Cranberry, Pennsylvania.  The Company is engaged in the acquisition, production, exploration and development of oil, natural gas and NGLs in the Marcellus Shale, Utica Shale and Upper Devonian Shale.  It has a substantial highly contiguous acreage position in the Appalachian Basin.

14.     Including both developed and undeveloped acreage, the Company controls approximately:

- 129,900 gross acres in Western Pennsylvania that the Company believes are prospective for Marcellus Shale exploration;

- 129,900 gross acres in Western Pennsylvania that the Company believes are prospective for Upper Devonian Shale exploration; and

- 182,400 gross acres in Western Pennsylvania and Eastern Ohio that the Company believes are prospective for Utica Shale exploration.

15.     Roughly eighty-two percent of the acreage is held by production (*i.e.*, it allows the Company to continue to operate on the leased property beyond the initial lease term as long as the leased property is producing a minimum paying quantity of oil and gas).  This allows for flexibility in choosing future locations to drill and complete.

16.     The Debtors own a working interest[2] in approximately 11,064 oil and gas leases in Ohio and Pennsylvania (the "Leases").[3]  Rex owns an interest in 565 wells (the "Wells")—a working interest in 441 of the Wells and an overriding royalty interest in 124 of the Wells.  The Debtors operate approximately 252 of the Wells.  Of the Wells that the Debtors operate,

---

[2]     The Debtors own working interests in certain oil and gas leases under which a third party is the operator.
[3]     The Debtors have an overriding royalty interest in an additional 21 leases in Pennsylvania.

approximately 229 are producing, 20 have recently been completed and/or drilled and 3 are shut-in and will be plugged.

17.     The Company strategically focuses capital expenditures on drilling in areas that would maximize returns for the Company.  Moreover, over the years of operation, the Company has established a supply chain program that ensures that it obtains the best value possible from its service providers.  The Company's total revenue from continuing operations for the year ended December 31, 2017 was $205.3 million, which was primarily derived from the sale of natural gas, NGLs and condensate.

### A.     The Debtors' Corporate Organizational Structure

18.     Rex Energy is the direct parent of each of the other Debtors, and all of the Debtors are organized under the laws of Delaware.  A corporate organization chart depicting the ownership structure of the Debtors and certain non-Debtor affiliates is attached hereto as Exhibit A.  The overall management of the Debtors is conducted by senior executives at their headquarters in State College, Pennsylvania.

19.     Prior to the Petition Date, two of Rex Energy's wholly-owned subsidiaries merged with other Debtors.  Specifically, on April 10, 2018, Rex Energy IV, LLC merged with Rex Energy I, LLC, with Rex Energy I, LLC being the surviving entity; and PennTex Resources Illinois, Inc. merged with Rex Energy I, LLC, with Rex Energy I, LLC being the surviving entity.  Immediately prior to the mergers, neither Rex Energy IV, LLC nor PennTex Resources Illinois, Inc. had operations or assets.  Similarly, non-Debtors R.E. Disposal, LLC, R.E. Ventures Holdings, LLC and Rex Energy Marketing, LLC are disregarded entities with no operations, no assets and no liabilities.

20.     Rex Energy went public on the Nasdaq Global Market on July 28, 2007, trading under ticker symbol "REXX."  On April 12, 2018, Rex Energy's common stock was delisted

from the Nasdaq Stock Exchange; however, Rex Energy's common stock is still bought and sold

over-the-counter.  As of the Petition Date, there are approximately 10,708,287 shares of Rex

Energy's common stock outstanding, with a total market capitalization of approximately $8.78

million.  There are also approximately 3,987 shares of Rex Energy Series A convertible preferred

stock outstanding, with a market price of approximately $1.59 million.

**B.      The Debtors' Prepetition Obligations**

21.      As of the Petition Date, the Debtors had approximately $884 million in

outstanding funded debt, as described in more detail below.  A summary of the funded debt

obligations is as follows:

| | Facility | Agent/Lenders | Borrower/Guarantors | Secured/ Unsecured | Principal Amount Outstanding (USD millions) |
|---|---|---|---|---|---|
| 1. | Term Loan Credit Agreement, dated as of April 28, 2017 | Angelo, Gordon Energy Servicer, LLC, as administrative agent and collateral agent and the lenders party thereto | Rex Energy Corporation Rex Energy I, LLC Rex Energy Operating Corp. R.E. Gas Development, LLC | Secured – First Lien | $261.3 (excluding Make Whole amounts) |
| 2. | Prepetition Second Lien Indenture governing 1.0%/8.0% senior secured notes due 2020 dated March 31, 2016 | Wilmington Savings Fund Society, FSB, as Trustee | Rex Energy Corporation Rex Energy I, LLC Rex Energy Operating Corp. R.E. Gas Development, LLC | Secured – Second Lien | $588.0 |
| 3. | Supplemental Indenture governing 8.875% notes due 2020 dated March 31, 2016 | BOKF, NA, as Trustee | Rex Energy Corporation Rex Energy I, LLC Rex Energy Operating Corp. R.E. Gas Development, LLC | Unsecured | $7.3 |
| 4. | Supplemental Indenture governing 6.25% notes due 2022, dated March 31, 2016 | BOKF, NA, as Trustee | Rex Energy Corporation Rex Energy I, LLC Rex Energy Operating Corp. R.E. Gas Development, LLC | Unsecured | $5.4 |
| 5. | Hedging Obligations | BP Energy Company<br><br>Macquarie Bank Limited | Rex Energy Corporation | Secured | $22.0 (contingent current mark to market termination value) |
| | | | | **TOTAL** | **$884** |

A.      **Prepetition First Lien Credit Agreement**

22.      On April 28, 2017, the Debtors entered into a term loan credit agreement

(the "Prepetition First Lien Credit Agreement") with Angelo, Gordon Energy Servicer, LLC

("Angelo, Gordon"), as administrative agent (the "Prepetition First Lien Agent") and collateral

agent, Macquarie Bank Limited, as issuing bank, and the lenders from time to time party thereto

(the "Prepetition First Lien Lenders").

23.     The Prepetition First Lien Credit Agreement provides for a maximum

commitment of $300,000,0000, comprised of (a) a $143,500,000 secured term loan facility and

(b) a $156,500,000 secured delayed draw term loan facility, which includes a letter of credit

subfacility ("Letter of Credit Subfacility").  The Debtors used the proceeds of the loans under the

Prepetition First Lien Credit Agreement to refinance loans under their prior credit facility, fees

and expenses related thereto, to cash collateralize letters of credit under the Letter of Credit

Subfacility and for general corporate purposes.  There is currently approximately $261,315,322

outstanding under the Prepetition First Lien Credit Agreement.

24.     The Prepetition First Lien Credit Agreement matures on the earlier of (a) April

28, 2021 and (b) the date that is six months prior to the maturity of the Debtors' 1.00/8.00%

Senior Secured Second Lien Notes due 2020 (the "Prepetition Second Lien Notes" and, the

holders thereof, the "Prepetition Second Lien Noteholders") unless less than $25,000,000

Prepetition Second Lien Notes are then outstanding and the Prepetition First Lien Credit

Agreement is not in default.

25.     Obligations under the Prepetition First Lien Credit Agreement are secured by

liens on and security interests in substantially all of the assets of the Debtors.  These assets

include a substantial portion of the producing Wells in which Rex has an interest, with the

exception of approximately seven newly-drilled Wells located in Carroll County, OH and Butler

County, PA that remained unencumbered as of the Petition Date.

26.     The Prepetition First Lien Credit Agreement contains a provision that to the

extent the lenders are repaid in whole or in part prior to the maturity date or the outstanding

indebtedness under the facility is accelerated for any reason, certain yield maintenance and call

protection amounts may become payable to the Prepetition First Lien Lenders (the "Make

Whole").  The Make Whole is calculated based on the sum of remaining interest payments and

certain fees due on all loans for the remainder of the make whole period, which terminates on

October 28, 2019.

27.    Access to the loan facility has been severely limited since February 26, 2018,

because of an occurrence of an event of default under the Prepetition First Lien Credit

Agreement as a result of the Debtors' failure to deliver their quarterly financial statements for the

quarter ended December 31, 2017, as well as certain related certificates, before February 14,

2018.  Additionally, on February 26, 2018, the Debtors submitted a draw certificate which

erroneously represented that no defaults existed at such time, resulting in an additional event of

default.  As a result of the aforementioned defaults, the Debtors have been unable to make

additional draws under the Prepetition First Lien Credit Agreement, other than for purposes of

cash collateralizing the existing letter of credit exposure and drawing an additional sum of

approximately $6.2 million on May 14, 2018 to provide the Company with the necessary

liquidity to get to the commencement of these Cases.

28.    On April 3, 2018, the Debtors and the Prepetition Fist Lien Lenders entered into a

forbearance agreement, pursuant to which the Prepetition First Lien Lenders agreed to forbear

from exercising their rights and remedies under the Prepetition First Lien Credit Agreement in

respect of certain defaults and events of default thereunder through April 16, 2018 (the "First

Lien Forbearance Agreement").  The forbearance period set forth in the First Lien Forbearance

Agreement was subsequently extended several times through May 17, 2018.

29.    On April 27, 2018, the Debtors received from the Prepetition First Lien Agent a

Notice of Acceleration of the outstanding amounts due under the Prepetition First Lien Credit

Agreement, including notes and loans, together with all accrued interest thereon, all fees, yield

maintenance amount, call protection amount and other similar amounts thereon (the "Notice of Acceleration").

**B.    Prepetition Second Lien Notes**

30.    On March 31, 2016, the Company completed an exchange offer and consent solicitation related to the Company's then outstanding unsecured 8.875% Senior Notes due 2020 (the "2020 Notes") and 6.250% Senior Notes due 2022 (the "2022 Notes" and, together with the 2020 Notes, the "Unsecured Notes").  The Company offered to exchange any and all of the Unsecured Notes held by eligible holders for up to (a) $675,000,000 aggregate principal amount of Prepetition Second Lien Notes and (b) $10,125,000 of shares of the Company's common stock.

31.    The Prepetition Second Lien Notes are governed by an indenture (the "Prepetition Second Lien Indenture") dated March 31, 2016, among Rex Energy, the subsidiary guarantors party thereto, and Wilmington Savings Fund Society, FSB, as trustee (the "Second Lien Indenture Trustee").  As of the Petition Date, there were approximately $587,606,000 of Prepetition Second Lien Notes outstanding.  The obligations under the Prepetition Second Lien Indenture are secured by liens on substantially all of the Debtors' assets, which liens are contractually junior to the liens securing the obligations under the Prepetition First Lien Credit Agreement.  The rights and obligations between the Prepetition First Lien Lenders and the Prepetition Second Lien Noteholders with respect to the collateral securing their respective claims are governed by the Intercreditor Agreement dated March 31, 2016 between such parties.

32.    On April 2, 2018, the Debtors missed an interest payment in the amount of $23,504,242.44 due under the Prepetition Second Lien Indenture, which resulted in an event of default under the Prepetition Second Lien Indenture after the passage of a 30-day grace period (the "Interest Payment Default").  On May 3, 2018, the Debtors and the Ad Hoc Second Lien

Group (as defined below) entered into a forbearance agreement, pursuant to which the Ad Hoc

Second Lien Group agreed to forbear from exercising their rights and remedies under the

Prepetition Second Lien Indenture, through May 9, 2018, in respect of certain defaults

thereunder, including the Interest Payment Default (the "Second Lien Forbearance Agreement").

The forbearance period set forth in the Second Lien Forbearance Agreement was later extended

through May 17, 2018.

### C.    Unsecured Notes

33.    The Company still has outstanding 2020 Notes and 2022 Notes, which were not

tendered in the March 2016 exchange offer described above.  The 2020 Notes and 2022 Notes

are governed, respectively, by the indenture governing the 2020 Notes and the indenture

governing the 2022 Notes between the Company, the subsidiary guarantors party thereto and

BOKF, NA, as trustee for each of the 2020 Notes and the 2022 Notes (the "Unsecured Notes

Indenture Trustee").[4]  As of the Petition Date, approximately $7.33 million and $5.36 million in

principal was outstanding on account of the 2020 Notes and 2022 Notes, respectively.

34.    On May 4, 2018, the Company received a notice of default and acceleration from

the Unsecured Notes Indenture Trustee.

### D.    Hedging Obligations

35.    The Company manages the commodity risks it is exposed to in the normal course

of business through hedging transactions with BP Energy Company and Macquarie Bank

Limited under ISDA Master Agreements (the "Prepetition Secured Swap Agreements").  The

Company previously participated in hedging transactions with J. Aron & Company LLC

("J. Aron"), but the relationship with J. Aron terminated shortly prior to the Petition Date.  The

---

[4]    Effective December 5, 2016, BOKF, NA became the trustee for each of the 2020 Notes and the 2022
Notes.  Prior to its resignation on December 5, 2016, Wilmington Trust, National Association served as the
trustee.

obligations under the Prepetition Secured Swap Agreements are secured by a first lien on

substantially all of the assets of the Debtors, which ranks *pari passu* with the first priority liens

securing the obligations under the Prepetition First Lien Credit Agreement.  The rights and

obligations among the Prepetition First Lien Agent, the Prepetition First Lien Lenders and the

Secured Swap Parties (as defined in the Prepetition First Lien Credit Agreement) with respect to

the collateral securing their respective claims are governed by the Intercreditor Agreement dated

April 28, 2017 between such parties.  As of the Petition Date, the Debtors estimated an

approximate contingent liability position of $22 million under the existing swaps.

### III. EVENTS LEADING TO THE FILING OF THESE CASES AND THE PATH FORWARD

#### A.      The Company's Cost-Reduction Initiatives

36.      Throughout its history, the Company has implemented various strategies to

respond to adverse fluctuations in commodity prices.  Among other things, the Company has

(a) sought out ways to increase efficiency, including through employing advanced technologies

and reducing operational costs, (b) actively allocated capital in an effort to maximize value and

estimated proved reserve growth based on assessment of the relative risk of development and the

economics of potential projects, (c) sought to maintain balance and diversification in the types of

production (*i.e.*, oil, natural gas and natural gas liquids) and (d) engaged in a diversified hedge

program to mitigate the exposure to volatile commodity prices.

37.      Additionally, in the years leading up to the filing of these Cases, the Company

(a) exchanged approximately $588 million of unsecured notes for the Prepetition Second Lien

Notes, which conserved approximately $62 million in cash interest through October 2017,

(b) opportunistically exchanged both debt and preferred stock into common stock and

(c) monetized midstream assets and non-core oil and gas assets.  Moreover, the Company

selectively sought out profitable oil and gas property acquisitions and joint venture opportunities ("JVs").  In August of 2010, the Company partnered with Summit Discovery Resources II, LLC, a wholly owned subsidiary of Japan's Sumitomo Corporation, to drill and complete additional wells in the Marcellus Shale.  In March of 2015, the Company entered a JV with an affiliate of private equity firm ArcLight Capital Partners LLC in the Butler Operated Area of the Marcellus Shale.  In March of 2016, the Company entered into a JV agreement with an affiliate of Benefit Street Partners L.L.C. to jointly develop 58 specifically designated wells in the Company's Moraine East and Warrior North operated areas.  The Company still engages in joint operations with these entities.

38.      Despite the aforementioned cost-reduction initiatives, however, and other efforts to improve their liquidity profile, the ongoing sharp decline in oil and natural gas prices that began in 2014 stifled the Company's performance in recent years and resulted in decreased revenues, which ultimately affected the Debtors' liquidity and balance sheet and forced them to seek to restructure their debt.  Thus, in late 2016, the Company began engaging with existing and new lenders to enhance liquidity and reduce its debt load.

39.      In October 2016, the Debtors and certain Prepetition Second Lien Noteholders entered into a non-disclosure agreement to explore a restructuring of the Prepetition Second Lien Notes.  Those discussions resulted in a proposed transaction whereby the Debtors would exchange the Prepetition Second Lien Notes for new convertible senior secured notes at par.  The proposed transaction would have provided for a structured equitization of the Prepetition Second Lien Notes and a material deleveraging of the Debtors' balance sheet.  This proposed transaction, however, was never consummated, and in November 2016, the Debtors publicly disclosed that this proposed transaction had been discussed, and that these discussions had ended.

40.    Given that the Debtors had yet to find a solution to their liquidity issues, the

Debtors continued discussions with other interested parties, including the Debtors' first-lien

lenders.  At the time, the existing first lien credit facility was a revolving credit agreement, under

which the maximum outstanding loans could not exceed at any time the then applicable

borrowing base, which borrowing base was, from time to time, adjusted.  The facility was set to

mature on September 12, 2019.  The Debtors expected the borrowing base to be reduced on the

next redetermination date, resulting in availability under the credit agreement to go down below

the level the Company thought necessary or appropriate for its needs (and possibly requirement

prepayment of outstanding loans).

41.    Thus, in April of 2017, the Debtors refinanced its existing first lien credit facility

by entering into the Prepetition First Lien Credit Agreement.  While the Prepetition First Lien

Credit Agreement temporarily alleviated the Company's liquidity issues by providing

approximately $110 million of additional borrowing capacity, the Company remained more

vulnerable to economic downturns and adverse developments in the energy industry, in part, as a

result of the high interest expense under the Prepetition Second Lien Indenture.

**B.    Prepetition Negotiations with Lenders**

42.    In mid-2017, despite the absence of any default, the Company began considering

additional liquidity-improvement and deleveraging initiatives, including debt-for-debt and debt-

for-equity exchange, joint venture opportunities and asset sales.  With the assistance of their

advisors, Jones Day and Perella Weinberg Partners ("Perella") the Debtors commenced

extensive, good-faith discussions with an ad hoc group of certain holders of the Prepetition

Second Lien Notes (the "Ad Hoc Second Lien Group") regarding a potential restructuring of the

Prepetition Second Lien Notes.  The Ad Hoc Second Lien Group retained Akin Gump Strauss

Hauer & Feld LLP as counsel and Stephens Inc. as financial advisor in connection with these discussions.

43.     To facilitate restructuring discussions, in September of 2017, the Company entered into non-disclosure agreements with legal and financial advisors to the Ad Hoc Second Lien Group.  After a period of due diligence by Ad Hoc Second Lien Group's advisors, on January 10, 2018, the Company entered into confidentiality agreements with individual members of the Ad Hoc Second Lien Group and began exchanging confidential information to inform more in-depth discussions among principals.  As part of the restructuring discussions, the parties exchanged term sheets for restructuring proposals, contemplating potential out-of-court and in-court restructuring transactions.  Specifically, the Company circulated a restructuring term sheet on January 22, 2018; the Ad Hoc Second Lien Group circulated another term sheet on January 26, 2018.

44.     These discussions, however, did not result in a consensual transaction and, in February of 2018, the Company publicly disclosed the materials distributed to the Prepetition Second Lien Noteholders under their confidentiality agreements.

45.     In the meantime, the Company's liquidity position continued to worsen.  In February of 2018, the Company requested a draw of $18.5 million of delayed-draw loans available under the Prepetition First Lien Credit Agreement.  Although the Prepetition First Lien Lenders funded this request, due to subsequent defaults that were declared under the Prepetition First Lien Credit Agreement, including certain reporting related defaults, the Company was prevented from accessing the remaining delayed-draw availability.[5]

---

[5]     As a result of these defaults, the Prepetition First Lien Lenders also increased the rate on the Prepetition First Lien Credit Agreement by the default rate of 4.0%.  The Debtors have, however, been able to access the facility to cash collateralize the outstanding letter of credit exposure, and to draw an additional $6.2 million on May 14, 2018 to provide necessary liquidity pending the filing of these Cases.

46.     Given its deteriorating financial position, the Company continued its efforts to improve liquidity, including through a sale of, among other things, its non-operated oil and gas interests in Westmoreland, Centre and Clearfield Counties in Pennsylvania.  Although the sale netted the Debtors approximately $16.6 million, it did not improve the Company's liquidity position enough to avoid a comprehensive restructuring.

47.     Thus, on April 2, 2018, the Company determined not to make a semi-annual interest payment in the amount of approximately $25 million due on the Prepetition Second Lien Notes.  While the Prepetition Second Lien Indenture provides for a 30-day grace period, the non-payment of interest resulted in a cross-default under the Prepetition First Lien Credit Agreement, threatening the risk of acceleration of the outstanding obligations under that facility and enforcement of remedies by the Prepetition First Lien Agent.  On April 3, 2018, the Debtors and Prepetition First Lien Agent agreed to enter into the First Lien Forbearance Agreement in order to engage in restructuring discussions.  The First Lien Forbearance Agreement did not prevent the Prepetition First Lien Agent from accelerating the amounts owed under the Prepetition First Lien Credit Agreement but prevented the Prepetition First Lien Agent from taking any enforcement actions with respect to any accelerated obligations during the forbearance period. Thus, on April 27, 2018, the Debtors received from the Prepetition First Lien Agent a Notice of Acceleration of the outstanding amounts due under the Prepetition First Lien Credit Agreement. Nevertheless, in accordance with the terms of First Lien Forbearance Agreement, the Prepetition First Lien Agent did not take any enforcement action, and the parties continued restructuring discussions.  In addition, in order to provide the Company with sufficient liquidity to finalize negotiating a consensual restructuring and to allow a smooth transition into these Cases, the

Prepetition First Lien Lenders provided the Debtors an additional $6.2 million of liquidity.  The

forbearance period, which has since been extended several times, terminated on May 17, 2018.

48.    Because no restructuring deal was reached upon the expiration of the grace period

under the Prepetition Second Lien Indenture, on May 3, 2018, the Company and the Ad Hoc

Second Lien Group entered into the Second Lien Forbearance Agreement, pursuant to which the

Prepetition Second Lien Noteholders agreed to temporarily forbear from exercising their rights

with respect to the Interest Payment Default.  That forbearance period, which has also been

extended to accommodate additional negotiations with the Company, also terminated on May 17,

2018.

### C.    The Restructuring Support Agreement and DIP Negotiations

49.    Prior to and during the various forbearance periods, the Debtors engaged in

extensive, good faith negotiations with the Prepetition First Lien Lenders and the Ad Hoc

Second Lien Group.  During this time, the Company's board of directors (the "Board") conducted

regular Board meetings and frequent meetings and calls with the Company's management team

and its financial and legal advisors.  The Board encouraged open and transparent dialogue with

the Company's secured creditors and considered every proposal and potential restructuring

opportunity.

50.    As a result of these good faith negotiations, on May 17, 2018, the Debtors, the

Prepetition First Lien Lenders, holding 100% of the loans outstanding under the Prepetition First

Lien Credit Facility, and the Ad Hoc Second Lien Group, holding in the aggregate approximately

71.8% of the outstanding Prepetition Second Lien Notes, finalized an agreement on the terms of

a restructuring as set forth in the Restructuring Support Agreement (the "RSA"), a copy of which

is attached hereto as Exhibit B.  In accordance with the RSA, the Debtors, the Prepetition First

Lien Lenders and the Ad Hoc Second Lien Group have agreed on the basic terms of a sale

process designed to encourage a robust auction for substantially all of the Debtors' assets (the "Sale Process").  The Debtors will also simultaneously pursue a plan process pursuant to which (i) if a sale is not consummated, the lenders under the DIP Facility (the "DIP Lenders") and Prepetition First Lien Lenders would receive 100% of the equity in the reorganized company or (ii) if a sale is consummated (including through a chapter 11 plan), the obligations owing to the DIP Lenders and Prepetition First Lien Lenders would be repaid in full from the net proceeds of such sale and the Prepetition Second Lien Noteholders would receive the excess proceeds from such sale (the "Plan Process").  Attached to the RSA as exhibits are two term sheets: (1) a restructuring term sheet, which outlines the terms of a comprehensive agreement between the Company, the Prepetition First Lien Lenders and the Ad Hoc Second Lien Group with respect to the Make Whole and the Sale Process; and (2) a plan term sheet, which outlines the terms of the Plan Process.  Under the RSA (and subject to the terms thereof), the Debtors, the Prepetition First Lien Lenders and the Ad Hoc Second Lien Group agreed, among other things, to support the Sale Process and the Plan Process, as applicable, and to abide by certain milestones regarding the Sale Process and the Plan Process and administration of these Cases.

51.     Under the RSA, the Sale Process and Plan Process will proceed in tandem, such that the failure to receive a satisfactory qualified bid will not delay an implementation of a plan to equitize the DIP Facility and the Prepetition First Lien Credit Agreement.  Even if the Sale Process is successful, the plan will be necessary to ensure an orderly wind-down of the Debtors' estates and the distribution of any excess proceeds of the sale.

52.     In order to provide the Debtors with sufficient funds to afford them an opportunity to continue the Debtors' operations while pursuing the Sale Process and/or the Plan

Process, the Prepetition First Lien Agent and Prepetition First Lien Lenders agreed to provide the Debtors with the DIP Facility.

## IV. DIP MOTION[6]

53.     The DIP Facility will allow the Company to maintain a minimum level of operations and fulfill obligations to certain of their key creditor constituencies while the Debtors pursue restructuring efforts and a sale of their assets or an alternative Plan Process.  The Debtors' obligations under the DIP Facility will be secured by a valid, binding, continuing, enforceable, fully-perfected first priority, senior priming lien on, and security interest in, all Unencumbered Property and Prepetition Collateral, and junior liens on any Prepetition Collateral that is encumbered by Non-Primed Liens.

54.     I believe that the DIP Facility represents the best terms for financing available following arm's-length negotiations and a marketing process to third party financing sources undertaken by Perella.  The DIP Facility will permit the Debtors to continue operations while transitioning into these Cases and fulfilling their obligations to certain key creditor constituencies. Without the DIP Facility, the Debtors will experience an immediate liquidity shortfall and will be unable to maintain the level of operations necessary to preserve the value of their estates.

55.     The principal terms of the DIP Facility, which are described in more detail in the DIP Motion, and the Tracy Declaration and Conly Declaration in support of the DIP Motion, are as follows:[7]

---

[6]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the *Debtors' Emergency Motion Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001 and 9014 for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Senior Secured, Superpriority, Post-Petition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Priming Liens, Priority Liens and Super-Priority Claims, (IV) Granting Adequate Protection to Prepetition Secured Parties and (V) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C)* filed contemporaneously herewith (the "DIP Motion").

[7]     The following is only a summary of the relevant terms, and the terms of the DIP Facility and any related documents shall definitively govern the relationship between the parties thereto.

- Debtor Rex Energy is the borrower under the DIP Facility and the other Debtors are guarantors.

- Angelo, Gordon has been designated to serve as administrative and collateral agent for the DIP Lenders.

- The maturity of the DIP Facility is the earlier of:

  - 6 months after the Petition Date;

  - 40 days after entry of the interim order approving the DIP Motion unless the final order approving the DIP Motion is entered;

  - Effective date of any plan of reorganization approved in these Cases;

  - Sale of all or substantially all assets of the Debtors pursuant to Section 363 of the Bankruptcy Code; and

  - Acceleration of the DIP Loans and the termination of the commitments thereunder.

- The interest rate payable by the Debtors under the DIP Facility is LIBOR + 8.75% and payable monthly in arrears with 1.00% LIBOR floor.

56.    Additionally, the DIP Facility sets forth a series of milestones that the Debtors must adhere to in order to avoid an event of default.  These milestones include:

- Entry of an order approving the Debtors' entry into the DIP Facility on an interim basis no later than three (3) business days after the Petition Date;

- Entry of an order approving the Debtors' entry into the DIP Facility on a final basis no later than forty (40) days after the Petition Date;

- Entry of an order approving bidding procedures and authority to sell substantially all of Debtors' assets no later than fifty (50) days after the Petition Date;

- Entry of an order approving the disclosure statement no later than seventy-five (75) days after the Petition Date;

- A deadline for bids for the purchase of the Debtors' assets occurring no later than one hundred fifteen (115) days after the Petition Date;

- An auction for the sale of the Debtors' assets occurring no later than one hundred twenty-five (125) days after the Petition Date; and

- The closing of any sale and distribution of sale proceeds or occurrence of the effective date of a confirmed plan no later than one hundred seventy (170) days after the Petition Date.

57.    I believe that these milestones are reasonable, capable of satisfaction and consistent with the Debtors' desire to maximize the value of their estates and minimize the costs of administering these Cases.  Further, these milestones, in addition to the other terms of the DIP Facility, are the result of lengthy, hard-fought negotiations and are integrated in an overall proposal that provides the best possible terms for funding available to the Debtors.  The Ad Hoc Second Lien Group has reviewed the DIP Facility and has expressed its support of the DIP Facility.

58.    The funding provided by the DIP Facility is essential to allow the Debtors to preserve the value of their assets during these Cases while pursuing the Sale Process or the Plan Process while also honoring their obligations during these Cases.  I, therefore, believe that the Debtors' entry into the DIP Facility is a reasonable exercise of their business judgment and in the best interests of their estates.

## V.  FIRST DAY PLEADINGS

59.    In addition to the DIP Motion, contemporaneously with the filing of these Cases, the Debtors filed the First Day Pleadings seeking relief related to the administration of these Cases and the Debtors' vendors, employees, operations and cash and financing needs.  The Debtors respectfully request that the proposed relief described in each of the First Day Pleadings be granted as critical to maximizing the value of their estates.  A description of the relief requested in and the facts supporting each of the First Day Pleadings is set forth below.

A.    **Debtors'** *Ex Parte* **Motion for Entry of an Order (A) Scheduling Expedited Hearings on Certain First Day Motions and (B) Approving Form and Manner of Notice Thereof**

60.    The Debtors have filed a motion seeking to:  (a) schedule an expedited hearing to consider the First Day Pleadings; and (b) approve the form and manner of notice of such expedited hearing.  The relief requested in this motion is required to ensure the continuation of

the Debtors' business operations and a smooth transition by the Debtors into chapter 11.  Absent

the relief requested in the First Day Pleadings, the Debtors' operations will cease and the Debtors

and their employees and creditors would suffer substantial and irreparable harm.

**B.    Debtors' *Ex Parte* Emergency Motion (I) Designating these Chapter 11 Cases as Complex Chapter 11 Bankruptcy Cases and (II) Establishing Omnibus Hearing Dates and Times**

61.    The Debtors have filed a motion seeking to:  (a) designate these Cases as complex

chapter 11 cases pursuant to the local rules of the Court and (b) establish omnibus hearing dates

and times for considering all motions and other matters in these Cases.  The Debtors filed a total

of 17 First Day Pleadings requesting expedited relief and have a multi-layer capital structure that

involves publicly traded preferred and common stock and thousands of parties in interest.  In

light of the foregoing, designating these Cases as complex will streamline the chapter 11 cases

and ease the related administrative and operational burdens.

**C.    Debtors' Emergency Motion for Entry of an Order Directing the Joint Administration of the Debtors' Chapter 11 Cases**

62.    The Debtors have filed a motion to jointly administer the Debtors' bankruptcy

cases.  As in many large chapter 11 cases that are jointly administered, the Debtors do not

maintain lists of the names and addresses of their respective creditors on a debtor-by-debtor

basis.  Given the integrated nature of the Debtors' operations, joint administration of these Cases

will provide significant administrative convenience without harming the substantive rights of any

party in interest.  Moreover, joint administration will be more efficient, convenient for the Court

and cost-effective for all parties in interest.

**D.**     **Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Maintain and File a Consolidated Creditor Matrix, (II) Authorizing the Filing of a Consolidated List of Top 30 Unsecured Creditors, (III) Approving the Master Service List and (IV) Approving the Form and Manner of Notice of the Commencement of the Debtors' Chapter 11 Cases.**

63.     The Debtors have filed a motion seeking:  (a) authority to maintain and file a consolidated creditor matrix; (b) authority to file a consolidated list of top 30 creditors in lieu of filing separate top 20 lists for each Debtor; (c) approval of the form and manner of the notice of commencement of the Debtors' chapter 11 cases; and (d) approving the master service list.

64.     First, the preparation of separate lists of creditors for each of the Debtors would be duplicative (as the Debtors have many of the same creditors), expensive and time consuming. Therefore, the Debtors request authority to maintain and file a consolidated creditor matrix. Second, filing a consolidated list of top 30 creditors will help alleviate administrative burdens, unnecessary costs and the possibility of duplicative service.  Third, the notice of commencement of the Debtors' chapter 11 cases is substantially in the form of Official Bankruptcy Form 309F and will be served on all of the parties on the Debtors' consolidated creditor matrix.  Fourth, the master service list complies with the Bankruptcy Rules and the Local Rules and includes, among others:  (a) the U.S. Trustee for the Western District of Pennsylvania; (b) those creditors holding the 30 largest unsecured claims against the Debtors' estates; (c) the Internal Revenue Service, the Securities and Exchange Commission and any other federal, state or local governmental agency to the extent required by the Bankruptcy Code, the Bankruptcy Rules, the Local Rules or order of the Court; and (d) the Debtors' significant creditors and equity holders, including, but not limited to, (i) Angelo, Gordon, (ii) Wilmington Savings Fund Society, FSB and (iii) BOKF, NA.

**E.      Debtors' Emergency Motion for Entry of an Order Extending the Time to
File Schedules of Assets and Liabilities and Statements of Financial Affairs**

65.      The Debtors have filed a motion for an order granting additional time to file their

schedules and statements of financial affairs (collectively, the "Schedules and Statements").  The

Debtors estimate that they have thousands of creditors and other parties in interest on a

consolidated basis.  The breadth of the Debtors' business operations requires the Debtors to

maintain voluminous books and records and complex accounting systems.  Given the size and

complexity of their business operations, the number of creditors, the large amount of information

that must be assembled to prepare the Schedules and Statements and the hundreds of employee

and advisor hours required to complete the Schedules and Statements, the Debtors submit that it

would be unnecessarily burdensome to the Debtors to complete these during the immediate

period following the Petition Date.

**F.      Debtors' Emergency Application for Appointment and Retention of Prime
Clerk LLC as Claims and Noticing Agent *Nunc Pro Tunc* to the Petition Date**

66.      The Debtors have filed an application[8] to appoint Prime Clerk LLC ("Prime

Clerk") as claims and noticing agent in these Cases.  Although the Debtors have not yet filed

their schedules of assets and liabilities, they anticipate that there will be thousands of entities to

be noticed.  In view of the number of anticipated claimants and the complexity of the Debtors'

businesses, the Debtors submit that the appointment of a claims and noticing agent is necessary

and in the best interests of both the Debtors' estates and their creditors.

---

[8]      The Debtors' application is supported by a separate declaration of Benjamin J. Steele of Prime Clerk.

G.    **Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Establishing Notice and Objection Procedures for Transfers of Equity Securities and (II) Establishing a Record Date for Notice and Sell-Down Procedures for Trading in Claims Against the Debtors' Estates**

67.    The Debtor have filed a motion for interim and final orders establishing (a) notice and objection procedures regarding certain transfers of beneficial interests in equity securities in Rex Energy and (ii) a record date for notice and potential sell-down procedures for trading in claims against the Debtors.

68.    The Debtors have generated, and are currently generating, a significant amount of net operating loss carryforwards ("NOLs") for U.S. federal income tax purposes.  As of December 31, 2017, the Debtors had approximately $257 million of unlimited NOLs that were available to offset taxable income.  These NOLs could translate into potential future federal income tax savings for the Debtors.  In particular, the NOLs may be available to the Debtors to offset taxable income generated by transactions completed during the course of these Cases.

69.    It is my understanding that the Debtors' ability to use their tax attributes, however, could be severely limited under Section 382 of title 26 of the United States Code as a result of the trading and accumulation of their equity securities prior to consummation of a chapter 11 plan.  The Debtors thus seek to establish procedures to oversee the trading of their equity securities, so that the Debtors can preserve their ability to seek substantive relief at the appropriate time, particularly if it appears that additional trading may jeopardize the use of their NOLs under Section 382.

H.    **Debtors' Emergency Motion for an Order Authorizing the Debtors to Pay Certain Prepetition Taxes**

70.    The Debtors have filed a motion for an order authorizing, but not directing, the Debtors, in their sole discretion, to remit and pay certain outstanding prepetition taxes, as described herein.  The Debtors, in the ordinary course of their businesses, have incurred

prepetition sales and use taxes, franchise taxes, impact fees and certain other taxes or fees that are necessary for the Debtors to continue to conduct business or for which there may be personal liability for responsible officers or directors (the "Prepetition Taxes").  Prior to the Petition Date, the Debtors estimate that approximately $5,335,661.91 in aggregate Prepetition Taxes were collected, withheld or incurred but have not yet been paid or remitted to the relevant taxing authority.

71.     As of the Petition Date, the Debtors estimate that the aggregate amount of taxes due and unpaid to the taxing authorities is approximately:

(i)      Sales and Use – $285,000.16;

(ii)     Franchise Taxes – $81,876.50; and

(iii)    Impact Fees – $4,907,950.00.

72.     The Debtors seek payment of the Prepetition Taxes to avoid potential business disruptions that could arise as a result of a failure to pay the Prepetition Taxes.

**I.      Debtors' Emergency Motion for an Order Authorizing the Debtors to Continue Their Insurance Programs and Pay Related Obligations**

73.     The Debtors have filed a motion for an order seeking authority to:  (a) honor all of their prepetition obligations under their insurance policies, including related premiums, deductibles, reimbursement or retention amounts, amounts owed pursuant to premium financing agreements and amounts owed to their broker; (b) honor postpetition insurance obligations in the ordinary course of their businesses; and (c) maintain, supplement, amend, extend, renew and/or replace, without further court approval, their insurance policies.

74.     In the ordinary course of their business, the Debtors maintain the following types of insurance policies, among others:  commercial property, inland marine (care, custody and control), commercial general liability, pollution liability, commercial automobile, commercial

umbrella/excess liability, directors and officers liability, employment practices liability, fiduciary liability, employed lawyers liability, cyber liability, control well coverage and workers' compensation (collectively, as such policies may be supplemented, amended, extended, renewed or replaced, the "Insurance Policies").  The aggregate amount of the annual premiums under all of the Insurance Policies, most of which are financed pursuant to premium financing agreements, total approximately $1,514,363.00.  The Debtors seek authority to pay $95,809.56 in premiums and financing costs arising from both the prepetition and postpetition periods, to their insurance carriers, which will become due and owing in the first 30 days of these Cases.

75.    The maintenance of the Insurance Policies is necessary for the Debtors to continue to operate during the course of these Cases and required by certain contractual obligations and applicable state law.  If the Debtors do not honor their prepetition obligations under the Insurance Policies, the Debtors' coverage may lapse and they may need to obtain alternative insurance coverage at an increased cost.  Indeed, were coverage to lapse, the Debtors may be unable to obtain alternative replacement insurance at all at a critical juncture in these Cases.  Without insurance coverage, the Debtors would be immediately exposed to potentially catastrophic liability to the detriment of their creditors.

**J.    Debtors' Emergency Motion for Interim and Final Orders Establishing Adequate Assurance Procedures with Respect to the Debtors' Utility Providers**

76.    The Debtors have filed a motion for interim and final orders:  (a) establishing procedures for addressing any requests that a utility company (collectively, the "Utility Companies") may make for additional assurance of payment; (b) prohibiting the Utility Companies from altering, refusing or discontinuing services to, or discriminating against, the Debtors; and (c) approving the proposed adequate assurance deposit as adequate assurance of postpetition payment to the Utility Companies.

77.     The Debtors currently use various types of utility services, including, but not limited to, electric, natural gas, heat, water, waste disposal, telecommunications, internet connectivity and other similar utility services provided by numerous Utility Companies.  The Debtors cannot operate their businesses in the absence of continuous and uninterrupted utility services.  The temporary or permanent discontinuation of the utility services would irreparably disrupt the Debtors' operations and, as a result, fundamentally undermine the Debtors' efforts in these Cases.  Accordingly, it is essential that the Utility Companies continue to provide uninterrupted services to the Debtors.

78.     The Debtors pay approximately $601,480.00 each month for utility services, which is calculated based on a twelve-month average and for new accounts, the average during the service period.  To provide additional assurance of payment, the Debtors propose to deposit $276,846.00 (the "Adequate Assurance Deposit") into a separate, interest bearing account.  The Adequate Assurance Deposit represents approximately fourteen days of the Debtors' estimated aggregate costs for utility services subsequent to the Petition Date and may be applied to any postpetition defaults in payment to the Utility Companies.  The Adequate Assurance Deposit was calculated by annualizing monthly costs, calculating the daily cost by 365 days and multiplying the daily cost by fourteen days.

79.     The Debtors submit that the Adequate Assurance Deposit, together with the Debtors' ability to pay for future utility services in the ordinary course of business, constitutes sufficient adequate assurance of future payment to the Utility Companies.

**K.     Debtors' Emergency Motion for Interim and Final Orders Authorizing the Debtors to Pay Prepetition Employee Wages, Benefits and Related Items**

80.     The Debtors have filed a motion for interim and final orders seeking authority (i) to pay and/or honor (A) certain prepetition employee wages, salaries, overtime pay and other

accrued compensation, as well as related prepetition deductions from employees' wages and salaries; (B) obligations related to the Debtors' bonus programs for non-insider employees; (C) certain obligations related to paid time off; (D) unreimbursed and unpaid prepetition business expenses; (E) prepetition contributions to, and benefits under, employee benefit plans and programs and related processing costs, including the Debtors' 401(k) program, and the COBRA benefits; (F) certain prepetition severance-related obligations (pursuant to entry of a final order); and (G) all costs and expenses incident to the foregoing payments and contributions, including payroll-related taxes and related processing and administration costs; and (ii) to continue, on a postpetition basis, the Debtors' various benefits programs for their employees.

81.     As of the Petition Date, the Debtors have 102 full-time employees and 1 part-time employee.  The Debtors' employees are the nucleus of their operations, intimately familiar with the Debtors' businesses, processes and systems and possess unique skills, knowledge and relationships with the Debtors' vendors and business partners.  Maintaining the goodwill of the Debtors' employees and ensuring the uninterrupted availability of their services during this period of uncertainty is critical to the Debtors' reorganization.  Additionally, any harm resulting from the Debtors' failure to obtain the relief requested in this motion would not be limited to the Debtors' estates but would affect the Debtors' employees' ability to meet their own personal obligations.

82.     The Debtors believe that, as of the Petition Date, the aggregate amount of employee-related obligations is approximately $275,000.00, including amounts owed to third-party vendors who provide compensation and other benefit-related services.  The various components of the Debtors' employee-related obligations are described in further detail in the motion.

83.     The Debtors are not seeking to make any payments to employees in excess of the statutory priority cap imposed by sections 507(a)(4) and 507(a)(5), but it is possible that payments to employees could ultimately exceed the cap when all of the accrued benefits programs are included.  The Debtors, however, view each of their benefits programs as critical components of their employees' total compensation packages.  The Debtors' employees are essential to the continued operation and success of their business, and the failure to make payments due to them could ultimately result in the loss of employees during this critical restructuring period.

**L.     Debtors' Emergency Motion for Interim and Final Orders (I) Authorizing the Debtors to Pay Joint Interest Billings, Royalties, Related Taxes and Certain Lease Obligations and (II) Granting Related Relief**

84.     The Debtors have filed a motion for interim and final orders seeking authority to pay joint interest billings, royalties and related taxes and certain lease obligations.  The Debtors own a right to extract minerals (a "<u>Working Interest</u>") in approximately 11,064 oil and gas Leases in Ohio and Pennsylvania.[9]  The Leases under which one of the Debtors is the operator are generally subject to or burdened by one or more of:  royalty interests ("<u>Royalty Interests</u>"), overriding royalty interests ("<u>ORRI</u>"), non-participating royalty interests ("<u>NPRI</u>"), net profits interests ("<u>NPI</u>"), production payments ("<u>Production Payments</u>") and third party Working Interests (collectively, Working Interests, Royalty Interests, ORRI, NPRI, NPI and Production Payments, the "<u>Interests</u>").  Failure to make payments on account of the Interests would have a material adverse effect on the Debtors and their operations, including, without limitation, potential cancellation, forfeiture or termination of the Leases, penalties and interest, turnover actions, conversion claims, significant lien claims, constructive trust claims, litigation and, in some instances, removal as operator.

---

[9]     The Debtors have an overriding royalty interest in an additional 21 leases in Pennsylvania.

85.     The Debtors are parties to numerous JOAs governing operations of the wells in which they own a Working Interest.  The JOAs govern the relationship between joint interest holders in the Leases.  Under some of the JOAs, a third party is the operator and the Debtors are responsible for paying their pro rata portion of the operating expenses ("Joint Interest Billings") to the operator.  Certain of the Debtors' JOAs grant security rights to the counterparties thereunder in the amount of unpaid Joint Interest Billings.  Accordingly, to the extent the Debtors do not pay Joint Interest Billings, their interests under certain of the JOAs may be burdened by liens granted to the counterparties.

86.     Additionally, in Ohio, the Debtors are required to pay taxes imposed on the removal of nonrenewable resources such as crude oil and natural gas (the "Severance Taxes") to certain taxing authorities each month.  Typically, the Debtors' leases require each Working Interest owner to pay directly its pro rata share of the Severance Taxes.  Failure to pay the Severance Taxes when due could result in penalties, liens to secure payment of outstanding Severance Taxes and disruption of the Debtors' operations.

87.     Additionally, pursuant to their Leases, the Debtors are required to make certain rental payments ("Delay Rentals"), certain payments pursuant to shut-in royalty clauses ("Shut-In Payments"), certain damages payments ("Damages Payments"), certain bonus payments ("Bonus Payments") and certain cash in lieu of free gas payments ("Cash in Lieu Payments" and, collectively with Delay Rentals, Shut-In Payments, Damages Payments, Bonus Payments, Withholding Taxes and Severance Taxes, the "Lease Obligations").  Failure to pay the Lease Obligations could have a material adverse effect upon the Debtors and their operations, including in certain circumstances, inter alia, the loss of the underlying Lease.  Accordingly, paying the

Lease Obligations is critical to the Debtors' ability to continue to operate their businesses and preserve their assets.

> **M.    Debtors' Emergency Motion for Order Authorizing the Debtors to Honor Their Obligations to Purchasers and Midstream-Related Parties in the Ordinary Course of Business**

88.    The Debtors have filed a motion for an order seeking authority to continue to pay and/or honor their obligations to the purchasers (the "Purchasers") of their oil, natural gas and natural gas liquids and those third parties (the "Midstream-Related Parties") that transport and market their products in connection with the sale process.  The Debtors have various purchase and sale agreements with the Purchasers and various transportation and marketing agreements with the Midstream-Related Parties.  In the ordinary course of business, as of the Petition Date, the Debtors believe that they will owe directly the Midstream-Related Parties approximately $18,508,000.00 related to the prepetition period, which amount has not yet been finally quantified and for which the Debtors have not yet received invoices.  The Debtors seek to pay these prepetition amounts that will come due and to continue paying and/or honoring all obligations to the Purchasers and the Midstream-Related Parties on a postposition basis in the ordinary course of business.

89.    The Purchasers and the Midstream-Related Parties compose the core of the Debtors' business, and without their confidence in and support of the Debtors during these Cases, the Debtors' reorganization efforts will be materially stifled.  Through this motion, the Debtors intend to signal to the Purchasers and the Midstream-Related Parties that, at this early juncture in these Cases and throughout these Cases, they intend to continue to conduct business as usual.

90.    Additionally, in some instances, the purchase and sale agreements address directly the transportation of the Debtors' products by a Midstream-Related Party, and the purchase and sale agreement provides for the Purchaser to deduct the amount it pays to the Midstream-Related

Party to transport the Debtors' product from the purchase price it pays to the applicable Debtor.

Some purchase and sale agreements also provide for the Purchasers to deduct from the purchase

price owed to the Debtors other amounts owed by the Debtors to the Purchasers that are related

to the purchase and sale of the Debtors' products.  By this Motion, the Debtors seek authority to

continue to allow the Purchasers to deduct the amounts that they pay to the Midstream-Related

Parties and amounts that the Debtors owe the Purchasers related to the purchase and sale of the

Debtors' products from the purchase price paid to the applicable Debtor, regardless of whether

those amounts relate to the prepetition period or the postpetition period.

91.     Accordingly, by this motion, the Debtors seek to modify the automatic stay, to the

extent necessary, to allow the Purchasers to continue netting amounts and obligations in these

limited circumstances under specific purchase and sale agreements.  Netting of this type is

common and administratively important in the oil and gas industry generally, and prior to the

Petition Date, the Purchasers have engaged in such netting of amounts and obligations in the

ordinary course of business, pursuant to specific terms in their purchase and sale agreements

with the Debtors.  Without the authority to continue netting these obligations, the Debtors will be

unable to conduct business as usual and may lose the confidence of and relationships built with

the Purchasers and the Midstream-Related Parties.

**N.     Debtors' Emergency Motion for Interim and Final Orders Authorizing the Payment of Certain Prepetition Claims of Certain Prepetition Lien Claimants**

92.     The Debtors have filed a motion for interim and final orders authorizing the

payment of certain prepetition lien claimants in the amount of approximately $35,244,441.00.  In

connection with the day-to-day operation of their businesses, the Debtors employ the services of

various parties (the "Oil Patch Vendors") for the performance of construction, maintenance and

repair services at the Debtors' oil and gas wells.  The Oil Patch Vendors are critical components

of the Debtors' operations.  Many of the Oil Patch Vendors provide essential services to the

Debtors as part of the Debtors' efforts to drill wells and to maximize production at their operating

wells.  The work being performed in the fields is, in many instances, highly technical and

requires specialized knowledge and skills.  Only a limited number of construction, maintenance

and engineering service providers are equipped and available to perform these services.

Moreover, if one service provider decides to stop performing, then the entire operation at that

particular site will stop.  Replacing that provider will be nearly impossible given the current state

of the market and the waitlist attendant to booking professionals to perform these services.

93.     For the past few months, in accordance with the Debtors' business plan, many of

the Oil Patch Vendors have worked with the Debtors on wells that are in the final stages of

drilling and are almost ready to be brought online.  Prior to the Petition Date, the Debtors and the

Oil Patch Vendors finished drilling activities and some of these new wells have been brought

online.  The Debtors and the Oil Patch Vendors are continuing to work towards completion of all

of the wells.  The goods and services provided by the Oil Patch Vendors with respect to

completing these new wells is imperative to ensure that these final wells are ready to produce.

94.     The majority of the amounts owed to the Oil Patch Vendors relate to the small

number of sites where new wells have been or are being brought online, and these wells are some

of the Debtors' most valuable assets, as once complete, these wells are expected to produce

substantial amounts.  If all of these wells are not completed, then neither the Debtors nor their

creditors will realize the expected returns from these substantial investments and ultimately no

one will benefit.

95.     Under state law in the states in which the Debtors perform most of their drilling

and exploration activities, certain of the Oil Patch Vendors to whom the Debtors owe money (the

"Lien Claimants") may be entitled to assert mechanics' or other liens (collectively, the "Liens")

against the Debtors' property for amounts owed ("Lien Claims").  In fact, a number of Oil Patch

Vendors have already filed liens against the Debtors' property, which filings coincided with the

Debtors' public disclosures of their restructuring efforts.

96.     As of the Petition Date, the Debtors estimate that they owe or will owe

approximately $35,244,441.00 related to the prepetition period to the Lien Claimants.  Absent

payment to the Lien Claimants, the Debtors' wells that are nearly complete will remain offline

and title to the Debtors' most valuable assets could become clouded with liens.  The Debtors,

however, do not intend to satisfy each Lien Claim without scrutiny.  The motion establishes a

mechanism for the Debtors to involve and cooperate with the DIP Agent and the Ad Hoc Second

Lien Group on payments to the Lien Claimants and before paying any of the Lien Claims, the

Debtors, in consultation with their advisors, propose to (a) evaluate all payment requests,

(b) consider the amount of the claim, the Lien Claimant's ability to file a Lien and the importance

of the services or goods provided by the Lien Claimant to the Debtors' businesses and

(c) negotiate the best possible resolution for the benefit of the Debtors' estates.

97.     Additionally, the Debtors believe that certain of the Lien Claimants signed

contracts by which they purportedly waived their rights to file liens against the Debtors and their

property; however, while the Debtors reserve all rights with respect to those waivers, litigating

this issue would inevitably disrupt the Debtors' operations, distract the Debtors' management

during this critical juncture in these Cases and force the Debtors to incur expenses that may

exceed the amount of the particular Lien Claims.  In fact, the Debtors have had issues with and

been forced to expend time and resources on disputes with certain parties who attempted to get

around the lien waiver provisions in the Debtors' contracts.

98.     Accordingly, absent payment to the Lien Claimants, the Debtors' operations will face significant disruptions, some of the Debtors' most valuable assets will not be brought online and title to the Debtors' assets could become burdened with liens.  Again, before paying any of the Lien Claims, the Debtors intend to negotiate with the Lien Claimants and reach the best possible resolution for the benefit of their estates.

**O.      Debtors' Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Assume and Continue Performance Under Their Prepetition Secured Swap Agreements, (II) Enter Into Amendments, Modifications or Amendments and Restatements to the Prepetition Secured Swap Agreements, (III) Enter Into New Postpetition Hedging Agreements, (IV) Grant Related Liens And Superpriority Claims and (B) Modifying Automatic Stay**

99.     The Debtors have filed a motion[10] seeking authority to (a) continue performance under their Prepetition Secured Swap Agreements, on an interim and final basis, and assume the Prepetition Secured Swap Agreements, on a final basis, (b) amend existing Prepetition Secured Swap Agreements or enter into and perform under new post-petition hedging agreements and (c) grant certain lien and claims securing the obligations under the Prepetition Secured Swap Agreements and the obligations under any post-petition hedging agreements.  To protect their business against significant fluctuation in commodity pricing and the accompanying risk to the Debtors' cash flows, in the ordinary course of business, as is customary to the Debtors' industry, the Debtors have historically entered into financial derivative transactions to hedge the Debtors' exposures to the volatile commodity price market (the "Hedging Activities").  The Debtors believe that continuation of the Hedging Activities postpetition is in the best interests of the Debtors' estates and their creditors and will protect the Debtors' business against fluctuations in commodity pricing typical for the oil and gas industry.

---

[10]     The Debtors' motion is supported by a separate declaration of Thomas C. Stabley.

P.      **Debtors' Emergency Motion for Interim and Final Orders (I) Approving the Continued Use of the Debtors' Cash Management System, Bank Accounts and Business Forms, (II) Extending the Debtors' Time to Comply with Section 345(b) of the Bankruptcy Code, (III) Approving Continuation of Ordinary Course Intercompany Transactions and (IV) Granting Related Relief**

100.    The Debtors have filed a motion for interim and final orders authorizing the Debtors' continued use of (a) their current Cash Management System and (b) their existing bank accounts and business forms, including (i) authorizing the Debtors to open and close bank accounts; (ii) granting the Debtors a 30-day extension to comply with the requirements of section 345(b) of the Bankruptcy Code; (iii) approving the continuation of ordinary course intercompany transactions and according priority administrative expense status to all postpetition intercompany claims held by a Debtor against one or more of the other Debtors.

101.    In the ordinary course of business, the Debtors maintain an integrated cash management system (the "Cash Management System"), which provides well-established mechanisms for the collection, concentration, management, disbursement and investment of funds used in their operations.  The Debtors' Cash Management System consists of eight (8) domestic bank accounts, all held with Bank of America, N.A. ("BofA"): (1) an operating account for day-to-day operating needs, including payment of employee benefits, loan paydowns, making utility payments, tax payments and paying down general accounts payables; (2) two accounts dedicated to making royalty payments, payments pursuant to joint operating agreements with well operators, pay down development accounts payable and related taxes and outside interest payments; (3) a payroll account (the "Payroll Account"); (4) two interest bearing savings accounts opened to qualify the Company as a holding company for purposes of Pennsylvania franchise tax classifications; (5) a money market account that operates as cash collateral account for the corporate credit card held with BofA, and maintains a balance of approximately $40,027.85 (the "Money Market Account"); and (6) an LC cash collateral account opened to

deposit funds borrowed to fully cash collateralize the letter of credit exposure under the

Prepetition First Lien Credit Agreement and maintains a balance of approximately

$34,106,181.90.

102.    The Cash Management System also includes a corporate credit card account

issued under that certain Bank of America Commercial Card Account Agreement effective

October 2, 2017, used for employee meals/entertainment, travel expenses, supplies and other

incidental expenses.

103.    The aforementioned accounts (except the Payroll Account and the Money Market

Account) are subject to control agreements providing Angelo, Gordon, as collateral agent under

the Prepetition First Lien Credit Agreement, control of the Accounts after an event of default

under the Prepetition First Lien Credit Agreement.

104.    In the ordinary course of business, the Debtors use a variety of checks and

business forms.  To minimize expenses to their estates and avoid confusion during the pendency

of these Cases, the Debtors request that the Bankruptcy Court authorize the Debtors' continued

use of all existing preprinted correspondence and business forms (including, without limitation,

letterhead, checks and other business forms) as such forms were in existence immediately before

the Petition Date, without reference to the Debtors' status as debtors in possession, rather than

requiring the Debtors to incur the expense and delay of ordering entirely new business forms.

105.    In the ordinary course, BofA charges and the Debtors pay, honor or allow the

deduction from the appropriate account for, certain service charges and other fees, costs and

expenses (the "Bank Fees") to which the Banks may be entitled under the terms of and in

accordance with their contractual arrangements with the Debtors.  The Debtors owe

approximately $6,579.22 in Bank Fees per month and expect to pay approximately that amount

on a monthly basis going forward.  To minimize or eliminate any disruption to the Cash

Management System, the Debtors request authority to pay any prepetition Bank Fees and to

continue to pay the Bank Fees in the ordinary course postpetition.

106.    Also in the ordinary course, the Debtors engage in intercompany transactions and

transfers (the "Intercompany Transactions") resulting in the ordinary course creation of

intercompany receivables and payables (the "Intercompany Claims").  Accordingly, at any given

time there may be Intercompany Claims owing by one Debtor to another Debtor.  For example,

certain of the accounts belonging to one Debtor may be used to pay for amounts due and owing

by another Debtor.  The Debtors anticipate that Intercompany Transactions will likely continue

at least in the near term.  It is imperative that the Debtors be permitted to continue to engage in

the Intercompany Transactions during these Cases to avoid disruptions to their Cash

Management System.

107.    The Debtors have narrowly tailored the First Day Pleadings to meet their goals of:

(a) continuing their current operations in chapter 11 with as little disruption as possible;

(b) maintaining the confidence and support of their key partner, customer and employee

constituencies; and (c) establishing procedures for the efficient administration of these Cases.

108.    I have reviewed each of the First Day Pleadings (including the exhibits thereto)

and I believe the facts stated therein to be true and correct to the best of my knowledge with

appropriate reliance on corporate officers and advisors.  I incorporate by reference the factual

statements set forth in each of the First Day Pleadings as though set forth herein.

109.    It is my belief that the relief sought in each of the First Day Pleadings is necessary

to the successful implementation of the Debtors' efforts to maximize their creditors' recoveries.

It is my further belief that, with respect to those First Day Pleadings requesting the authority to

pay specific prepetition claims or continue selected prepetition programs—those First Day Pleadings seeking relief related to the Debtors' obligations to their employees, insurers and vendors, working interest holders and taxing authorities—the relief requested is essential to the maintenance of the Debtors' operations and necessary to avoid immediate and irreparable harm to the Debtors' estates and creditors.

110.    The success of these Cases depends upon the Debtors' ability to continue their operations without disruption while they negotiate a resolution with key creditor constituencies. The relief requested in the First Day Pleadings is a critical component of maintaining business as usual in order to negotiate a path forward for these Cases.

## **CONCLUSION**

111.    For all of the reasons set forth herein and in the First Day Pleadings, I respectfully request that the Court grant the relief requested in each of the First Day Pleadings.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Dated: May 18, 2018
     (State College, PA)

Thomas C. Stabley
Chief Executive Officer and President